UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------------

DINAH DONACIEN,

                          Plaintiff,

              v.

COMMISSIONER OF SOCIAL SECURITY,

                        Defendant.

----------------------------------------------------------------

NOT FOR PUBLICATION

**<u>MEMORANDUM & ORDER</u>**
19-CV-1528 (MKB)

MARGO K. BRODIE, United States District Judge:

       Plaintiff Dinah Donacien, proceeding *pro se*, commenced the above-captioned action on March 14, 2019, pursuant to 42 U.S.C. § 405(g), seeking review of a final decision of the Commissioner of Social Security (the "Commissioner") denying her claim for supplemental security income ("SSI") under the Social Security Act (the "SSA"). (Compl., Docket Entry No. 1.) The Commissioner moves for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, arguing that Administrative Law Judge Stanley K. Chin (the "ALJ") correctly found that Plaintiff is not disabled and the Appeals Council properly denied review of the ALJ's decision. (Comm'r Mot. for J. on the Pleadings, Docket Entry No. 12; Comm'r Mem. of Law in Supp. of Comm'r Mot. ("Comm'r Mem."), Docket Entry No. 13.)

       For the reasons discussed below, the Court denies the Commissioner's motion and remands this action for further administrative proceedings consistent with this Memorandum and Order.

## I.   Background

Plaintiff was born in 1992, (Certified Admin. R. ("R.") 30, 35, Docket Entry No. 9), completed high school and attended some college, (R. 61.)  Plaintiff previously worked as a summer day camp counselor, tutor, and clerical assistant but has not been employed since 2013. (R. 61.)

On July 18, 2015, Plaintiff applied for SSI, stating that she has been disabled as of January 21, 2014, due to anxiety and depression.  (R. 72.)  On October 2, 2015, the Social Security Administration denied Plaintiff's application and on November 5, 2015, Plaintiff requested a hearing before an administrative law judge.  (R. 42.)  An administrative hearing was held on June 22, 2018, before the ALJ.[1]  (R. 42.)  By decision dated July 5, 2018, the ALJ found Plaintiff was not disabled.  (R. 42–55.)  On March 1, 2019, the Appeals Council denied review, rendering the ALJ's decision final.  (R. 1–9.)  Plaintiff timely appealed to the Court.  (*See* Compl.)

### a.   Hearing before the ALJ

#### i.   Plaintiff's testimony

Plaintiff testified that she was fired from her last position as a summer camp counselor because she was unable to interact with the children as required.  (R. 62.)  In general, Plaintiff has difficulties being around other people and completing assigned tasks.  (R. 62.)  She has been depressed since age twelve and began receiving treatment for her depression at age eighteen. (R. 63–64.)  Plaintiff visited Dr. Reyes once every three weeks and met with her therapist once a week to treat her "schizo effective disorder."  (R. 63.)  Because of her symptoms, Plaintiff does not complete household chores, read, watch television, use a computer, or leave the house unless

---

[1]  Plaintiff was represented by counsel at the time of the hearing.  (*See* R. 42–55.)

she is accompanied by a family member.  (R. 65.)  On those occasions that she does leave the house, it is only for the purpose of attending her "appointments" at the "counseling center." (R. 65–66.)

### ii.   Vocational expert testimony

During Plaintiff's hearing, Mark Gendry testified as a vocational expert ("VE") and stated that Plaintiff likely completed each of her past jobs below the required skill level.  (R. 56, 66–67.)

The ALJ asked the VE to consider whether a hypothetical "individual the same age, education, [and with the same] past work as [Plaintiff]," who was "limited to short and simple routine instructions and tasks, performed in a work environment free of fast paced production quotas involving only simple work related decisions and infrequent and gradual workplace changes," and who was "limited to work that is isolated from the public with occasional interaction with coworkers and occasional interaction with supervisors . . . [and] . . . limited to jobs that do not involve large crowded environments," could "perform the claimant's past work as it was actually performed or generally performed in the [Dictionary of Occupational Titles]." (R. 67–68.)  The VE responded that this hypothetical individual would not be able to perform Plaintiff's past work but could complete medium unskilled jobs such as warehouse worker, industrial cleaner, or floor waxer.  (R. 68.)  The VE also indicated that to perform these jobs "a person needs to be able to interact appropriately at all times" with coworkers and supervisors. (R. 69.)

The ALJ then asked the VE to consider whether a second hypothetical individual could perform Plaintiff's past work where the individual was "the same age" as Plaintiff, had the same

"education and past work" as Plaintiff, had the same limitations as the first hypothetical

individual, and:

> in addition to the regularly scheduled breaks — would need to be allowed to be off task [twenty] percent of the day due to symptoms associated with their medical condition and due to symptoms this hypothetical individual would be absent from work two days per month.

(R. 68.)  The VE testified that an individual with such limitations could not perform Plaintiff's

past jobs or any other job.  (R. 69.)

### b.   Relevant medical evidence

#### i.   Dr. Abha Gupta, D.O.

On July 30, 2015, Plaintiff followed up with Dr. Abha Gupta, D.O., for medication

management, reporting that her "depressive symptoms . . . have worsened over the past year."

(R. 338.)  She had been feeling "more anxious and down, . . . having [two] panic attacks per day,

. . . [and] feeling a tightness in her stomach when she is in the bathroom at the shelter as this

reminds her [of] things her mother did to her in the bathroom when they were living together."

(R. 338.)  Dr. Gupta prescribed 20mg of Citalopram daily and weekly insight and supportive

psychotherapy.  (R. 338.)

Plaintiff returned to Dr. Gupta on September 3, 2015, and reported that she had been

admitted to the hospital on four occasions, was having trouble sleeping, experiencing anxiety,

strange smells ("urine smells like flowers to me"), and had a visual hallucination of her sister

while Plaintiff was in the hospital waiting room.  (R. 475.)  Dr. Gupta continued to prescribe

Prozac, which was prescribed in the hospital, prescribed Zyprexa, and recommended continued

weekly psychotherapy.  (R. 475.)  On September 10, 2015, Plaintiff reported doing well on

Zyprexa, denied hallucinations since the last session, and indicated that the medication regimen

was helping her overall.  (R. 474.)  Plaintiff had no overt manic or psychotic symptoms and

4

appeared less tense, however, Dr. Gupta noted that she was still "oddly related and is with a blunted affect" and "appears to be processing information but unclear how much she understands." (R. 474.) Dr. Gupta continued prescribing Plaintiff Prozac and Zyprexa. (R. 474.)

During a September 24, 2015 visit, Plaintiff again told Dr. Gupta that she was doing well, feeling more like herself, and denied experiencing any medication side effects. (R 473.) She reported good appetite and energy levels and being more in control of her thoughts, although she indicated that she was feeling more paranoid about her mother, with whom she was living. (R. 473.) Dr. Gupta continued Plaintiff on Prozac and Zyprexa but increased the Zyprexa dosage to help with paranoia and sleep disturbance. (R. 473.) Dr. Gupta diagnosed Plaintiff as having major depressive disorder and social anxiety and assessed a Global Assessment Function ("GAF") score of 55. (R. 724.) Plaintiff then transferred to the Blanton-Peale Counseling Center to obtain treatment closer to her home. (R. 724–25.)

### ii.  Dr. Christopher Flach, Ph. D., Consultative Examiner

On September 16, 2015, Dr. Christopher Flach, Ph.D., conducted an in-person consultative examination of Plaintiff. (R. 446–49.) Plaintiff reported that she: had been hospitalized four times in 2015 and was currently seeing a psychiatrist each month and a therapist every three weeks, (R. 446); was sleeping better on medication and had depression symptoms but had no anxiety symptoms, (R. 446); dresses and bathes herself and does some laundry and cleaning but does not cook, (R. 448); shops for food and can pay a bill, (R. 448); does not drive but takes the train "a little bit," (R. 448); socializes very little but gets along with her family "okay," (R. 448); and enjoys reading, (R. 448).

Dr. Flach noted that Plaintiff was appropriately dressed and well groomed and that her

thought process was coherent and goal-directed with no evidence of hallucinations, delusions, or paranoid thinking but that her remote memory skills were mildly impaired.  (R. 447–48.)  Dr. Flach also observed that Plaintiff had manic symptoms and was "talkative" and had "pressured speech," "psychomotor agitation," "elevated expansive mood," and "dysphoric mood."  (R. 447.)  Dr. Flach diagnosed Plaintiff with bipolar disorder with psychotic-like features, noting that schizoaffective disorder should be ruled out as a possible diagnosis.  (R. 449.)

In the Medical Source Statement, Dr. Flach confirmed that Plaintiff was able to follow and understand simple directions and instructions and perform simple tasks independently and that she had mild to moderate problems maintaining attention and concentration, performing complex tasks without some extra time and support, adequately relating to others, and dealing with stress.  (R. 448.)  Dr. Flach found that Plaintiff was able to maintain a regular schedule, learn new tasks, and make some appropriate decisions, even though her psychiatric problems would mildly to moderately interfere with her ability to function day to day.  (R. 448.)  Finding Plaintiff's prognosis to be fair to good, Dr. Flach recommended continued psychiatric treatment.  (R. 449.)

### iii.   Dr. E. Kamin, Ph. D., state agency psychological consultant

State agency psychological consultant Dr. E. Kamin, Ph.D., reviewed the record and completed a Disability Determination Explanation Report dated October 1, 2015.  (R. 72–80.)  Dr. Kamin concluded that Plaintiff could perform unskilled simple work that does not require her to be "close" to others.  (R. 80.)  He found that Plaintiff either had no limitations or was not significantly limited in her abilities to: carry out very short and simple instructions; perform activities within a schedule, maintain regular attendance, and be punctual; sustain an ordinary routine without special supervision; make simple work-related decisions; ask simple questions or

request assistance; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; be aware of normal hazards and take appropriate precautions; use public transportation; and set realistic goals.  (R. 78–79.)  He also concluded that Plaintiff has moderate limitations in her abilities to: carry out detailed instructions, maintain attention and concentration for extended periods, work in coordination with or in proximity to others without being distracted by them, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and respond appropriately to changes in work settings.  (R. 78–79.)

### iv.   Dr. Sylvia Reyes, M.D.

Between January of 2016 and October 31, 2018, Dr. Sylvia Reyes, M.D., a psychiatrist at Community Counseling and Mediation, conducted approximately twenty-three mental status examinations of Plaintiff on January 12 and 26, February 3, March 2 and 23, April 13, May 4 and 10, June 22 and 26, July 31, August 2 and 10, September 11, 14, and 18, October 2 and 23, and November 1, 2016, and on May 8, June 5, September 12, and October 31, 2018.

At the first mental status examination on January 12, 2016, Dr. Reyes found Plaintiff had good eye contact and was well groomed, cooperative, and friendly; her affect was depressed, but her speech was normal; her thought process was goal-directed and thought content devoid of paranoia, delusion, or obsessions; she did not react to internal or external stimuli; and her judgment and insight were fair to good.  (R. 510.)  Dr. Reyes diagnosed Plaintiff with post-traumatic stress disorder ("PTSD"), major depressive disorder, anxiety disorder NOS, and schizoaffective disorder, assessing a GAF score of 65.  (R. 510.)

On January 26, 2016, one day after being hospitalized for anxiety at Methodist Hospital (*see* R. 664–68), Plaintiff again met with Dr. Reyes, (R. 512). Dr. Reyes' mental status examination findings were consistent with her January 12, 2016 findings. (R. 512–14.) Dr. Reyes also completed a Treating Physician's Wellness Plan Report (the "Wellness Report"), diagnosing Plaintiff with chronic PTSD and major depressive disorder and finding that Plaintiff was temporarily unemployable for three months. (R. 492–93.) Plaintiff's February 3, March 2 and 23, April 13, May 4 and 10, and June 22, 2016, visits with Dr. Reyes resulted in similar mental status examination findings, diagnoses, GAF scores of 65, and treatment. (R. 514–27.)

On June 26, 2016, Dr. Reyes updated the Wellness Report and diagnosed Plaintiff with schizoaffective disorder, PTSD, and anxiety disorder. (R. 479–80.) Dr. Reyes checked boxes indicating that Plaintiff's condition had not stabilized and that, as a result, she would be unable to work for at least twelve months. (R. 480.)

On July 31, 2016, Dr. Reyes' mental status examination again found Plaintiff maintained good eye contact and was well groomed, cooperative, and friendly; her psychomotor activity was normal yet "retarded"; her affect was depressed and her speech was normal; her thought process was goal-directed and thought content devoid of paranoia, delusion, or obsessions; she was not reacting to internal or external stimuli and her judgment and insight were fair to good. (R. 528–29.) Dr. Reyes diagnosed Plaintiff with bipolar disorder II, PTSD, major depressive disorder, anxiety disorder NOS, and schizoaffective disorder and assessed a GAF score of 65. (R. 528–29.)

The same day, Dr. Reyes completed a Medical Source Statement of Ability to Do Work-Related Activities, on which she noted that she was reducing Plaintiff's dosage of Seroquel due to palpitations and adding prescriptions of Latuda, Prozac, and Vistaril. (R. 482.) Dr. Reyes

8

indicated that: Plaintiff would be moderately impaired in her abilities to make judgments on simple work-related decisions; understand and remember complex instructions; interact appropriately with the public; and respond appropriately to usual work situations and to changes in a routine work setting.  (R. 481–82.)  Dr. Reyes indicated that: Plaintiff would be markedly impaired in her abilities to understand, remember, and carry out simple instructions; carry out complex instructions; make judgments on complex work-related decisions; and interact appropriately with supervisors and coworkers.  (R. 482.)  Dr. Reyes further noted that mood instability affected Plaintiff's ability to function in a work setting.  (R. 482.)

Dr. Reyes' August 2 and 10, 2016 mental status examination findings, diagnoses, GAF scores, and treatment were consistent with her assessments in July.  (R. 530–32.)  On August 10, Dr. Reyes again updated the Wellness Report, (R. 477–78), noting that Plaintiff suffered from bipolar disorder II NOS, PTSD, major depressive disorder, and anxiety disorder NOS, (R. 477). The report again indicates that Plaintiff's condition had not stabilized, rendering her unable to work for at least twelve months.  (R. 478.)

Plaintiff's September 11, 14, and 18, October 2 and 23, and November 1, 2016, (R. 508–09, 534–44), mental status examination findings, diagnoses, GAF scores, and treatment are consistent with Dr. Reyes' prior examinations.[2]  (R. 494–509.)  These records further indicate that Plaintiff suffers from the following chronic symptoms:

> flashbacks, avoidances, nightmares, increased startle reflex, hypervigilance, anxiety, depression, affective dysregulation, anhedonia, ("I thought the people at the hospital were staff at the shelter"), dissociative symptoms, feelings of worthlessness, hopelessness and helplessness, feelings of failure, feelings of guilt, self blame, poor appetite, low energy, poor concentration, social withdrawal and isolativeness and increased  worrying.

---

[2]  Yueshen Wang, MHC-LP, observed Plaintiff weekly for psychotherapy for schizoaffective disorder from May of 2017 through June of 2018.  (*See* R. 753–56.)

(R. 494.)  There is then approximately a year-and-a-half gap before Plaintiff resumes treatment

with Dr. Reyes.  The records associated with Plaintiff's resumed care on May 8 and June 5,

2018, reflect some deterioration in Plaintiff's condition.  During these visits, Dr. Reyes observed

that Plaintiff was moderately anxious, fidgety, and depressed, (R. 759–60, 762–65), but remained

cooperative and friendly, had normal speech, was goal-directed, and had logical thought

processes, (R. 759–60, 763–64).  Dr. Reyes assessed Plaintiff's GAF score at 55, indicating

moderate symptoms.  (R. 760, 764.)

### v.  Yueshen Wang, MHC-LP

In May of 2017, Plaintiff was referred to the Community Counseling and Mediation for

assistance with "issues related to Schizoaffective disorder [and] Bipolar symptoms."  (R. 806.)

On May 11, 2017, Plaintiff had a psychosocial intake assessment with Yueshen Wang, MHC-LP,

during which she reported spending time with people she had met at her day treatment program,

eating outside, watching television, and listening to music.  (R. 806–10.)  Wang found that

Plaintiff was well oriented in all spheres and appeared alert, that she had good eye contact, and

that her speech was logical, coherent, and goal-directed.  (R. 808.)  Plaintiff's recent and remote

memories were impaired, but she exhibited normal movements and activity level and had a

negligible degree of conceptual disorganization.  (R. 808.)

On June 8, 2018, Wang examined Plaintiff to conduct another Psychological Intake

Questionnaire, (R. 14–18), and determined that Plaintiff was oriented; her thoughts were clear;

she was alert; neatly dressed, and well groomed; her affect was appropriate; her mood was

euthymic; and she had unimpaired memory and no significant preoccupations, (R. 16–17).

Wang likewise found Plaintiff had good judgment, attention/concentration (focus), and impulse

control and, consistent with Dr. Reyes, assessed a GAF score of 55.  (R. 17.)

However, on June 14, 2018, when Wang evaluated Plaintiff in order to complete a medical report that Dr. Reyes cosigned, she found Plaintiff presented with a blunted affect, related poorly, and appeared internally preoccupied at times.  (R. 753.)  Plaintiff's mental status examination was consistent with a cooperative attitude and normal behavior, but Plaintiff's speech and thought content were hesitant, reflecting a "preoccupation about safety issues," and she demonstrated poor attention, concentration, memory, and ability to "perform calculations, serial sevens, etc."  (R. 754.)  The report further indicates that "[p]atient does not have any friends.  Patient barely talks to her family.  She stays in her room."  (R. 755.)

That same day, Wang completed a mental Medical Source Statement of Ability to Do Work-Related Activities, which Dr. Reyes also cosigned.  (R. 757–58.)  On the statement, Wang checked boxes indicating that Plaintiff would be moderately impaired in her ability to carry out short, simple instructions; would have marked limitations in her abilities to understand and remember such instructions, respond appropriately to work pressures in a usual work setting, and respond appropriately to changes in a work setting; and would have extreme limitations in her abilities to understand and remember detailed instructions, carry out detailed instructions, make judgments on simple work-related decisions, and interact appropriately with the public, supervisors, and coworkers.  (R. 757–58.)  Wang also found that Plaintiff suffered from paranoid thoughts and anxiety symptoms, did not remember her discussions with Wang in psychotherapy, thought people were going to harm her, and was not able to go outside alone.  (R. 758.)

### vi.   Hospital visits

Plaintiff was hospitalized three times in 2015: August 7–8, 2015, (*see* R. 341–50); August 15–25, 2015, (*see* R. 407–29); and August 29, 2015, (*see* R. 430–36); and she made

several trips to the Emergency Room in 2016: January 25, 2016, (*see* R. 664–68), August 5, 2016, (*see* 684–89), and December 5, 2016, (*see* R. 545–52).

On August 7, 2015, staff members at a shelter took Plaintiff to the emergency department of the Bronx Lebanon Hospital because of her "outburst and crying." (R. 344–47.) Plaintiff denied auditory hallucinations and reported that she was "overwhelmed" and was tired because she had not been sleeping as a result of "frequent nightmares and panic attacks." (R. 341, 348.) While observed overnight, Plaintiff appeared calm, cooperative, and appropriately interactive, with no evidence of mood lability or psychosis. (R. 341.)

During a subsequent hospitalization just over a week later, on August 15, 2015, Plaintiff was evaluated by Dr. Mark Stracks, who found Plaintiff suffered from paranoid delusions that shelter staff and residents were following her and had possibly subjected her to physical harm. (R. 413.) Dr. Stracks diagnosed Plaintiff with "schizoaffective [disorder]." (R. 423.) In general, Dr. Stracks found that Plaintiff "report[ed] a history of 'depression'; profound decline in function [and] prior treatment with aripiprazole raise concern for psychotic process, as do ideas of reference, paranoia, [and] disorganized thinking." (R. 414.) Finally, Dr. Stracks noted that "[g]iven several recent ER visits [and] noncompliance without treatment, [patient] has impaired ability to care for self [and] requires admission for stabilization [and] treatment." (R. 414.)

On January 25, 2016, Plaintiff went to the emergency department at Methodist Hospital complaining of "psychiatric problems" and anxiety. (R. 664–68.) She was given information on insomnia and prescribed Temazepam. (R. 665, 667–68.)

On August 5, 2016, Plaintiff went to Methodist Hospital emergency department for an anxiety attack. (R. 684.) The physicians prescribed medication for her symptoms and directed her to follow up with a psychiatrist. (R. 684–89.)

On December 5, 2016, Plaintiff underwent an evaluation for the continuing-day-treatment program ("CDTP") at New York Presbyterian Hospital and was ultimately admitted.  (R. 545–53.)  Plaintiff was referred to the CDTP by her psychiatrist for the rehabilitation and treatment of symptoms, coping skills, structure, and socialization.  (R. 546.)  Plaintiff's chief complaint was that she was "very closed off with people," (R. 545), and had only a few peripheral friends who could provide support, (R. 549–50).  At that time, Plaintiff was not being prescribed any psychotropic medications.  (R. 551.)  She was admitted because of the prior eighteen months of family stress and conflict, somewhat tenuous living situation, lack of structure from employment or school, social isolation, and stopping her medication one month earlier.  (R. 552.)  Plaintiff continued with the CDTP program until April 13, 2017.  (R. 565–629.).

    **c.   The ALJ's decision**

The ALJ conducted the five-step sequential analysis as required by the SSA.  First, the ALJ found that Plaintiff had not engaged in substantial gainful activity since July 18, 2015, the disability onset date.  (R. 44.)  Second, the ALJ found that Plaintiff had the following severe impairments: PTSD, generalized anxiety disorder, major depressive disorder, bipolar disorder, and schizoaffective disorder.  (R. 44.)  Third, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or equaled the severity of one of the impairments listed in Appendix 1 to Subpart P of Part 404 of the Social Security Regulations.  (R. 45.)  The ALJ found that Plaintiff only had mild limitations in understanding, remembering, or applying information and moderate limitations in interacting with others in maintaining concentration persistence or pace, and in her ability to adapt or manage herself.  (R. 45.)

Next, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform:

> a full range of work at all exertional levels but with the following
> nonexertional limitations: [Plaintiff] can perform simple, routine
> instructions and tasks performed in a work environment free of fast
> paced production requirements, and involving only simple work
> related decisions and infrequent and gradual work place changes.
> She can perform work isolated from the public with occasional
> interaction with coworkers and supervisors.  She cannot work in
> large, crowded environments.

(R. 46.)  In support of this determination, the ALJ relied on the record of Plaintiff's symptoms

and the extent to which Plaintiff's symptoms were consistent with the "objective medical

evidence and other evidence," as well as "opinion evidence."  (R. 46.)  The ALJ assigned

"moderate weight" to the opinion of psychiatric consultative examiner Dr. Flach because his

"assessment [was] generally consistent with his own exam findings" and with Plaintiff's

treatment records.  (R. 48.)  The ALJ assigned only "some weight" to the state agency consultant

because the doctor failed to "articulate specific functional limitations" and "some weight" to the

GAF scores because they provided a snapshot of clinicians' overall impression of Plaintiff

during treatment.  (R. 48.)

Finally, the ALJ assigned "little weight" to the medical opinion of Plaintiff's treating

psychologist Dr. Reyes, finding that even though her opinions were at times consistent with the

opinions of other providers, they were inconsistent with each other and were also at times

"internally inconsistent."  (R. 48.)  In support of discounting the weight of Dr. Reyes' opinion,

the ALJ noted that "on one checkbox form, Dr. Reyes indicated that [Plaintiff] had marked

restriction in understanding and remembering simple instructions, but only moderate difficulty

understanding and remembering complex instructions."  (R. 48.)  The ALJ further determined

that the suggested limitations "were disproportionate to the findings in Dr. Reyes' own treatment

records."  (R. 49.)  While "[h]er records typically described mood abnormalities and some

slowed pacing, . . . they were otherwise generally benign[,] including cooperative and friendly behavior, normal thought, intact memory, and fair to good judgment." (R. 49.)

In view of the VE's testimony, Plaintiff's age, education, work experience, and RFC, the ALJ found that Plaintiff "is capable of making a successful adjustment to other work that exists in significant numbers in the national economy." (R. 50.) Accordingly, the ALJ determined that Plaintiff was "not disabled." (R. 50.)

## II.   Discussion

### a.   Standard of review

"In reviewing a final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision." *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004), *as amended on reh'g in part*, 416 F.3d 101 (2d Cir. 2005); *see also Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam). "Substantial evidence is 'more than a mere scintilla' and 'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Lesterhuis v. Colvin*, 805 F.3d 83, 87 (2d Cir. 2015) (per curiam) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *see also McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014) (same). Once an ALJ finds facts, the court "can reject those facts 'only if a reasonable factfinder would *have to conclude otherwise*.'" *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012) (quoting *Warren v. Shalala*, 28 F.3d 1287, 1290 (8th Cir. 1994)). In deciding whether substantial evidence exists, the court "defer[s] to the Commissioner's resolution of conflicting evidence." *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012); *see also McIntyre*, 758 F.3d at 149 ("If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld."). The Commissioner's factual findings "'must be given conclusive effect' so long as they are supported by substantial evidence." *Genier v. Astrue*, 606 F.3d 46, 49

(2d Cir. 2010) (per curiam) (quoting *Schauer v. Schweiker*, 675 F.2d 55, 57 (2d Cir. 1982)). If, however, the Commissioner's decision is not supported by substantial evidence or is based on legal error, a court may set aside the Commissioner's decision. *Box v. Colvin*, 3 F. Supp. 3d 27, 41 (E.D.N.Y. 2014); *see also Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998). "In making such determinations, courts should be mindful that '[t]he Social Security Act is a remedial statute which must be "liberally applied"; its intent is inclusion rather than exclusion.'" *McCall v. Astrue*, No. 05-CV-2042, 2008 WL 5378121, at *8 (S.D.N.Y. Dec. 23, 2008) (alteration in original) (quoting *Rivera v. Schweiker*, 717 F.2d 719, 723 (2d Cir. 1983)).

### b. The ALJ incorrectly applied the treating physician rule and failed to develop the record

Dr. Reyes found Plaintiff to have marked and extreme limitations satisfying the criteria set forth in Appendix 1, (R. 482), and determined on two separate occasions — January 26, 2016 and June 26, 2016 — that Plaintiff was unable to work for three and twelve months, respectively, (R. 480, 492–93). She likewise found that Plaintiff's mood instability limited her ability to function in a work setting. (R. 482.)

The Commissioner argues that the ALJ appropriately assigned "little weight" to Dr. Reyes' opinion because her notes contained internal inconsistencies and were inconsistent with each other. (Comm'r Mem. 33–35.)

"[A] treating physician's statement that the claimant is disabled cannot itself be determinative."[3] *Micheli v. Astrue*, 501 F. App'x 26, 28 (2d Cir. 2012) (quoting *Snell v. Apfel*,

---

[3] "The regulations define 'treating source' as the claimant's 'own physician, psychologist, or other acceptable medical source who provides [a claimant] . . . with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant].'" *Brickhouse v. Astrue*, 331 F. App'x 875, 877 (2d Cir. 2009) (alterations in original) (quoting 20 C.F.R. § 404.1502).

177 F.3d 128, 133 (2d Cir. 1999)); *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003)

(same).  However, an ALJ "must follow" specific procedures "in determining the appropriate

weight to assign a treating physician's opinion." *Estrella v. Berryhill*, 925 F.3d 90, 95 (2d Cir.

2019); *see also Ferraro v. Saul*, 806 F. App'x 13, 14 (2d Cir. 2020) (holding that "[u]nder

Second Circuit precedent and the applicable regulations," the ALJ must follow the two-step

procedure laid out in *Estrella* to determine the appropriate weight to assign to the opinion of a

treating physician).  "First, the ALJ must decide whether the opinion is entitled to controlling

weight." *Estrella*, 925 F.3d at 95.  "The opinion of a claimant's treating physician as to the

nature and severity of an impairment is given 'controlling weight' so long as it 'is well-supported

by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with

the other substantial evidence in the case record.'" *Id.* (alterations omitted) (quoting *Burgess v.

Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (quoting 20 C.F.R. § 404.1527(c)(2)));[4] *see also

Lesterhuis*, 805 F.3d at 88 (discussing the treating physician rule); *Petrie v. Astrue*, 412 F. App'x

401, 405 (2d Cir. 2011) ("The opinion of a treating physician is accorded extra weight because

the continuity of treatment he provides and the doctor/patient relationship he develops place[s]

him in a unique position to make a complete and accurate diagnosis of his patient." (quoting

*Mongeur v. Heckler*, 722 F.2d 1033, 1039 n.2 (2d Cir. 1983) (per curiam))).

---

[4]  On January 18, 2017, the SSA published a final rule that changed the protocol for
evaluating medical opinion evidence.  *See* Revisions to Rules Regarding the Evaluation of
Medical Opinion Evidence, 82 Fed. Reg. 5844 (Jan. 18, 2017) (codified at 20 C.F.R. §§ 404 &
416).  The "new regulations apply only to claims filed on or after March 27, 2017." *Smith v.
Comm'r of Soc. Sec. Admin.*, 731 F. App'x 28, 30 n.1 (2d Cir. 2018).  Because Plaintiff's claim
was filed prior to that date, the Court refers to versions of the regulations that were in effect prior
to March 27, 2017.  *See White v. Berryhill*, No. 17-CV-4524, 2018 WL 4783974, at *4
(E.D.N.Y. Sept. 30, 2018) ("While the Act was amended effective March 27, 2017, the [c]ourt
reviews the ALJ's decision under the earlier regulations because the [p]laintiff's application
was filed before the new regulations went into effect." (quoting *Williams v. Colvin*, No. 16-CV-
2293, 2017 WL 3701480, at *1 (E.D.N.Y. Aug. 25, 2017))).

"Second, if the ALJ decides the opinion is not entitled to controlling weight, it must determine how much weight, if any, to give it." *Estrella*, 925 F.3d at 95. In deciding how much weight to assign to the opinion, the ALJ "must 'explicitly consider' the following, nonexclusive '*Burgess* factors': '(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist.'" *Id.* at 95–96 (quoting *Selian*, 708 F.3d at 418); *see also Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (per curiam) (citing 20 C.F.R. § 404.1527(d)(2)) (discussing the factors). "At both steps, the ALJ must 'give good reasons . . . for the weight [it gives the] treating source's [medical] opinion.'" *Estrella*, 925 F.3d 96 (alterations in original) (quoting *Halloran*, 362 F.3d at 32). "An ALJ's failure to 'explicitly' apply the *Burgess* factors when assigning weight at step two is a procedural error." *Id.* (quoting *Selian*, 708 F.3d at 419–20). "If 'the Commissioner has not [otherwise] provided 'good reasons' [for its weight assignment],'" the district court is unable to conclude that the procedural error is harmless, and remand is therefore appropriate, so that the ALJ can "comprehensively set forth [its] reasons." *Id.* (alterations in original) (quoting *Halloran*, 362 F.3d at 33); *see also Sanders v. Comm'r of Soc. Sec.*, 506 F. App'x 74, 77 (2d Cir. 2012) (noting that failure "to provide good reasons for not crediting the opinion of a claimant's treating physician is a ground for remand"); *Halloran*, 362 F.3d at 32–33 ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician[']s opinion . . . ."). However, if a "searching review of the record" assures the court that the "substance of the treating physician rule was not traversed," the court will affirm. *Estrella*, 925 F.3d at 96 (quoting *Halloran*, 362 F.3d at 32).

A district court must ensure that the ALJ has adequately developed the record in accordance with 20 C.F.R. § 404.1520(a)(3), which requires an ALJ to consider all evidence in the case record when making a determination or decision on a claimant's disability.  *See Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 508–09 (2d Cir. 2009) ("[I]t is the rule in our circuit that the [social security] ALJ, unlike a judge in a trial, must [on behalf of all claimants] . . . affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." (alterations in original) (quoting *Tejada v. Apfel*,167 F.3d 770, 774 (2d Cir.1999)). Although a "claimant has the general burden of proving that he or she has a disability within the meaning of the Act," *Burgess*, 537 F.3d at 128 (citing *Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir. 2002)), "'[b]ecause a hearing on disability benefits is a nonadversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record,'" *id.* (alteration in original) (quoting *Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir. 1999)); *see also Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 33 n.1 (2d Cir. 2013) ("Unlike a judge at trial, the ALJ has a duty to 'investigate and develop the facts and develop the arguments both for and against the granting of benefits.'" (quoting *Vincent v. Comm'r of Soc. Sec.*, 651 F.3d 299, 305 (2d Cir. 2011))).  This duty is present "[e]ven when a claimant is represented by counsel."  *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (collecting cases); *see also Eusepi v. Colvin*, 595 F. App'x 7, 9 (2d Cir. 2014) ("[T]he ALJ's general duty to develop the administrative record applies even where the applicant is represented by counsel . . . ."); *Rockwood v. Astrue*, 614 F. Supp. 2d 252, 279 (N.D.N.Y. 2009) ("[A]n ALJ has an affirmative duty to develop the record, even if the claimant is represented by counsel, if the medical record is ambiguous or incomplete." (first citing *Tejada*, 167 F.3d at 774; and then citing *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999))).  Moreover, where the claimant proceeds *pro se*, the ALJ has a heightened

duty to "protect a *pro se* claimant's rights 'by ensuring that all of the relevant facts [are] sufficiently developed and considered.'" *Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990) (alteration in original) (quoting *Hankerson v. Harris*, 636 F.2d 893, 895 (2d Cir.1980)); *see also Moran*, 569 F.3d at 112–13 (holding that when a claimant waives his right to counsel and proceeds *pro se*, the ALJ has a "heightened" duty to "develop the record in light of the essentially non-adversarial nature of a benefits proceeding").  In addition, the ALJ must attempt to fill in gaps in the record.  *See Rosa*, 168 F.3d at 79 & n.5 (explaining that the ALJ must attempt to fill "clear gaps" in the record, but "where there are no obvious gaps . . . and where the ALJ already possesses a 'complete medical history,'" the ALJ is under no obligation to seek additional information (quoting *Perez v. Chater*, 77 F.3d 41, 48 (2d Cir. 1996))); *Doria v. Colvin*, No. 14-CV-7476, 2015 WL 5567047, at *7 (S.D.N.Y. Sept. 22, 2015) ("The ALJ's duty to develop the record includes a duty to resolve apparent ambiguities relevant to the ALJ's disability determination.").

The duty to develop "includes ensuring that the record as a whole is complete and detailed enough to allow the ALJ to determine the claimant's RFC." *Sigmen v. Colvin*, No. 13-CV-0268, 2015 WL 251768, at *11 (E.D.N.Y. Jan. 20, 2015) (citing *Casino-Ortiz v. Astrue*, No. 06-CV-155, 2007 WL 2745704, at *7 (S.D.N.Y. Sept. 21, 2007), *report and recommendation adopted*, 2008 WL 461375 (Feb. 20, 2008)).  Pursuant to the SSA regulations, the Commissioner is obligated to "make every reasonable effort to help [the claimant] get medical evidence from [her] own medical sources and entities that maintain [her] medical sources' evidence when [the claimant] give[s] . . . permission to request the reports."  20 C.F.R. § 404.1512(b)(1); *see also Perez*, 77 F.3d at 47.  The Commissioner's duty to make such efforts includes the duty to seek, as part of such medical evidence and reports, a medical source statement or functional

assessment detailing the claimant's limitations. *See Robins v. Astrue*, No. 10-CV-3281, 2011 WL 2446371, at *3 (E.D.N.Y. June 15, 2011) ("Social Security Ruling 96–5p confirms that the Commissioner interprets those regulations to mean that '[a]djudicators are generally required to request that acceptable medical sources provide these statements with their medical reports.'" (alteration in original) (quoting SSR 96-5p, 1996 WL 374183 (July 2, 1996))).  Failing to adequately develop the record is an independent ground for vacating the ALJ's decision and remanding for further findings. *See Rosa*, 168 F.3d at 83 (finding remand "particularly appropriate" where the ALJ failed to obtain adequate information from treating physicians and potentially relevant information from other doctors); *see also Morris v. Berryhill*, 721 F. App'x 25, 27 (2d Cir. 2018) ("Failure to develop the record warrants remand."); *Green v. Astrue*, No. 08-CV-8435, 2012 WL 1414294, at *14 (S.D.N.Y. Apr. 24, 2012) ("[F]ailure to develop the record adequately is an independent ground for vacating the ALJ's decision and remanding the case." (citing *Moran*, 569 F.3d at 114–15)), *report and recommendation adopted*, 2012 WL 3069570 (S.D.N.Y. July 26, 2012).  Nevertheless, even where an ALJ fails to develop the opinion of a treating physician, remand may not be required "where . . . the record contains sufficient evidence from which an ALJ can assess the petitioner's [RFC]." *Tankisi*, 521 F. App'x at 34.

### i.   The ALJ appropriately determined that Dr. Reyes' opinion is not entitled to controlling weight

The ALJ appropriately determined that Dr. Reyes' opinion is not entitled to controlling weight, based on "internal[] inconsistent[cy] at times."  (R. 48.)  The ALJ specified two examples of internal inconsistency: (1) that "on one checkbox form, Dr. Reyes indicated that [Plaintiff] had marked restriction in understanding and remembering simple instructions, but only moderate difficulty understanding and remembering complex instructions" (R. 48); and

21

(2) that the suggested limitations in Dr. Reyes' opinion was "disproportionate to the findings in Dr. Reyes' own treatment records.  Her records typically described mood abnormalities and some slowed pacing, but they were otherwise generally benign including cooperative and friendly behavior, normal thought, intact memory, and fair to good judgment."  (R. 49.)

The treating physician's opinion is not entitled to controlling weight where there are internal inconsistencies in the physician's notes.  *See Micheli*, 501 F. App'x at 28 ("A physician's opinions are given less weight when his opinions are internally inconsistent." (citing *Michels v. Astrue,* 297 F. App'x 74, 75 (2d Cir.2008))).  In light of the apparent internal inconsistency of Dr. Reyes' determination that Plaintiff suffered marked restrictions in understanding and remembering simple instructions, but only moderate difficulty understanding and remembering complex instructions, (R. 482), the ALJ correctly determined that Dr. Reyes' opinion is not entitled to controlling weight.  *See Gibson v. Comm'r of Soc. Sec.*, No. 16-CV-3413, 2018 WL 3727343, at *14 (E.D.N.Y. Aug. 3, 2018) ("A treating source's opinion may not be entitled to controlling weight . . . if it is internally inconsistent." (first citing *Williams v. Comm'r of Soc. Sec*., 236 F. App'x 641, 643–44 (2d Cir. 2007); and then citing *Micheli*, 501 F. App'x at 28)).

### ii.    The ALJ erred in assigning little weight to Dr. Reyes' opinion

The ALJ committed procedural error in assigning little weight to Dr. Reyes' opinion because he failed to "expressly consider" the *Burgess* factors: "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist," *Selian*, 708 F.3d at 418 (citing *Burgess*, 537 F.3d at 129), before weighing the value of the opinion.  (*See* R. 48–49.)  First, the ALJ's decision fails to indicate the

length, extent, duration, or frequency of Plaintiff's treatment history with Dr. Reyes,

notwithstanding the fact that Dr. Reyes treated Plaintiff approximately twenty-three times

between July of 2016 and October of 2018.  (*See* R. 42–50); *see Amarante v. Comm'r of Soc.*

*Sec.*, No. 16-CV-717, 2017 WL 4326014, at *9 (S.D.N.Y. Sept. 8, 2017) ("A mental health

patient may have good days and bad days; [she] may respond to different stressors that are not

always active.  Thus, the longitudinal relationship between a mental health patient and her

treating physician provides the physician with a rich and nuanced understanding of the patient's

health that cannot be readily achieved by a single consultative examination." (alteration in

original) (quoting *Bodden v. Colvin*, No. 14-CV-8731, 2015 WL 8757129, at *9 (S.D.N.Y. Dec.

14, 2015) (citing *Richardson v. Astrue*, No. 09-CV-1841, 2009 WL 4793994, at *7 (S.D.N.Y.

Dec. 14, 2009)), *report and recommendation adopted*, 2017 WL 4326525 (S.D.N.Y. Sept. 26,

2017).  Given the extensive nature of Dr. Reyes' relationship with Plaintiff, having observed her

semi-frequently over the course of two years' time, the ALJ's failure to expressly weigh the

value of her diagnostic insight gleaned from consistent periodic observation of Plaintiff's health

against any inconsistencies in the record "deprives the court of the ability to determine accurately

whether his conclusion is supported by substantial evidence." *See Amarante*, 2017 WL 4326014,

at *9.

Second, the ALJ fails to expressly consider the remaining evidence that was consistent

with Dr. Reyes' opinion.  (*See* R. 48–49.)  Over the course of Dr. Reyes' treatment of Plaintiff,

Dr. Reyes consistently diagnosed Plaintiff with bipolar disorder, major depressive disorder, and

chronic PTSD.  Although the ALJ noted that Dr. Reyes' "opinions" were "cosigned" by other

providers, (*see* R. 48), he does not specifically identify those co-signed opinions or expressly

consider the extent to which the co-signed opinions were consistent with Dr. Reyes' independent opinion.

Lastly, the ALJ fails to acknowledge Dr. Reyes' specialty as a psychiatrist prior to assigning little weight to her opinion even though the ALJ should "generally give more weight to the medical opinion of a specialist about medical issues related to his or her area of specialty than to the medical opinion of a source who is not a specialist."  20 C.F.R. § 404.1527(c)(5).

### iii. The ALJ did not provide "good reasons" for assigning little weight to Dr. Reyes' opinion

Because the ALJ procedurally erred, the Court must determine whether the substance of the treating physician rule was traversed.  *Estrella*, 925 F.3d at 96 ("Because the ALJ procedurally erred, the question becomes whether 'a searching review of the record . . . assure[s] us] . . . that the substance of the . . . rule was not traversed . . . .'" (alteration in original) (quoting *Halloran*, 362 F.3d at 32)).  The Court finds that remand is appropriate as the ALJ procedurally erred and "a searching review of the record" does not otherwise provide "good reasons" for assigning "little weight" to Dr. Reyes' opinion.  *Id.*

The ALJ's first explanation for discounting Dr. Reyes' evaluation — that "on one checkbox form, Dr. Reyes indicated that [Plaintiff] had marked restriction in understanding and remembering simple instructions, but only moderate difficulty understanding and remembering complex instructions" creating an internal inconsistency, (R. 48) — is insufficient grounds for disregarding Dr. Reyes' written statement on the form noting that Plaintiff's "mood instability affects [her] ability to function in [a] work setting."  (R. 482); *see Brady v. Comm'r of Soc. Sec.*, No. 18-CV-1340, 2020 WL 613935, at *5 (W.D.N.Y. Feb. 10, 2020) (holding that an "allegedly inconsistent check-box" was not a good reason for rejecting treating physician opinion because the doctor "provided more narrative and detail on the form than just check-boxes"); *Sabater v.*

*Colvin*, No. 12-CV-4594, 2016 WL 1047080, at *5 n.6 (S.D.N.Y. Mar. 10, 2016); *Mix v. Astrue*,

No. 09-CV-16, 2010 WL 2545775, at *5 (W.D.N.Y. June 18, 2010) ("Form reports in which a

physician's obligation is only to check a box or fill in a blank are weak evidence at best."

(quoting *Mason v. Shalala*, 994 F.2d 1058, 1067 (3d Cir. 1993))); *see also Halloran*, 362 F.3d at

31 n.2 ("The standardized form, evidently furnished by the New York State Office of Temporary

and Disability Assistance, is only marginally useful for purposes of creating a meaningful and

reviewable factual record.").

Second, the ALJ's determination that Dr. Reyes' assessed limitations are disproportionate

to her clinical findings is not supported by the record.  In support of this view, the ALJ cites to

Dr. Reyes' evaluations of Plaintiff from January to November of 2016 and May of 2017 to June

of 2018, noting that these "records typically described mood abnormalities and some slowed

pacing, but they were otherwise generally benign including cooperative and friendly behavior,

normal thought, intact memory, and fair to good judgment."  (R. 49.)  To the extent the ALJ is

referring to Plaintiff's anxiety and depression as "mood abnormalities," this summary of the

medical records is incomplete and therefore inaccurate.  First, the ALJ fails to reconcile his

summary of Plaintiff's medical records with Dr. Reyes' clinical finding in October of 2016 that

Plaintiff suffered the following "chronic symptoms: flashbacks, avoidances, nightmares,

increased startle reflex, hypervigilance, anxiety, depression, affective dysregulation, anhedonia,

. . . dissociative symptoms, . . . poor concentration, social withdrawal and isolativeness."

(R. 536.)  Second, the ALJ overlooks the June 14, 2018 Psychiatric Medical Report and Medical

Source Statement, cosigned by Dr. Reyes, diagnosing Plaintiff as experiencing memory loss,

having trouble performing calculations and maintaining personal hygiene, and having paranoid

thoughts about people causing her physical or psychological harm ("say[ing] bad things behind

25

her [back] in a work setting"). (*See* R. 753–58.) As discussed above, the Medical Source Statement dated June 14, 2018, also noted that Plaintiff had marked limitations in her ability to understand and remember short, simple instructions, respond appropriately to work pressures in a usual work setting, and respond appropriately to changes in a routine work setting; and extreme limitations in her ability to understand and remember detailed instructions, carry out detailed instructions, make judgments on simple work-related decisions; and extreme limitations in her ability to interact appropriately with the public, supervisors, and coworkers. (R. 757–58.) In support of this assessment cosigned by Dr. Reyes, Wang reported that Plaintiff was unable to recall her conversations during her psychotherapy sessions. (R. 757.)

Because the record indicates that, in addition to anxiety and depression, Plaintiff also experienced short-term memory loss and other dissociative symptoms, (*see* R. 536, 757), paranoid thoughts, (*see, e.g.*, R. 756), flashbacks, (*see* R. 536), social isolation, (*see* R. 755), and an inability to leave the house unless accompanied by family members, (*see* R. 755), the Court finds that the ALJ mischaracterized Dr. Reyes' reports as indicating that Plaintiff only experienced mood abnormalities. *See Selian*, 708 F.3d at 418 (finding that the ALJ violated the treating physician rule by "misconstru[ing] the record" when determining the amount of weight to assign the treating physician's opinion); *Poles v. Colvin*, No. 14-CV-6622, 2015 WL 6024400, at *4 (W.D.N.Y. Oct. 15, 2015) (holding that, where the ALJ omitted records that undermined his conclusion, the ALJ's conclusion was "improperly based on a selective citation to, and mischaracterization of, the record" and "not supported by substantial evidence" (citing *Ericksson v. Comm'r of Soc. Sec.*, 557 F.3d 79, 82–84 (2d Cir. 2009))); *Johnston v. Colvin*, No. 13-CV-73, 2014 WL 1304715, at *3 (D. Conn. Mar. 31, 2014) ("In reasoning that [the treating physician's] opinion merited 'little weight,' the ALJ recounted only those aspects of the opinion that were

26

inconsistent with the weight of the objective medical evidence, . . . [but] neglected to acknowledge objective medical evidence in the record that did support [the treating physician's] opinion.  Failing to do so necessarily means that the ALJ's analysis of how much weight to ascribe to [the treating physician's] opinion was lacking."); *Arias v. Astrue*, No. 11-CV-1614, 2012 WL 6705873, at *2 (S.D.N.Y. Dec. 21, 2012) ("[An] ALJ may not simply ignore contradictory evidence . . . the ALJ must acknowledge the contradiction and explain why the conflicting [evidence] is being disregarded.").  In short, the ALJ's determination that Dr. Reyes' reports generally describe mood abnormalities and are disproportionate to the suggested limitations ignores portions of Dr. Reyes' and Wang's opinions that support Dr. Reyes' findings regarding Plaintiff's work limitations.

> ### iv.  The ALJ should have further developed the record to clarify the internal inconsistencies

Moreover, even if some of Dr. Reyes' treatments notes were inconsistent, the ALJ should have developed the record to seek clarification in view of the perceived inconsistencies.  To satisfy his threshold duty to develop the record, the ALJ should have followed up with Dr. Reyes to request supporting documentation or to obtain additional explanations for her findings.  *See Rosa*, 168 F.3d at 79 ("Even if the clinical findings were inadequate, it was the ALJ's duty to seek additional information from the treating physician *sua sponte.*" (alterations omitted) (quoting *Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998))); *Ahisar v. Comm'r of Soc. Sec.*, No. 14-CV-4134, 2015 WL 5719710, at *12 (E.D.N.Y. Sept. 29, 2015) ("[I]f a physician's report is believed to be insufficiently explained, lacking in support, or inconsistent with the physician's other reports, the ALJ must seek clarification and additional information from the physician, as needed, to fill any clear gaps before rejecting the doctor's opinion." (quoting *Correale–Englehart v. Astrue*, 687 F. Supp. 2d 396, 428 (S.D.N.Y. 2010))); *Vazquez v. Comm'r of Soc.*

*Sec.*, No. 14-CV-6900, 2015 WL 4562978, at *17 (S.D.N.Y. July 21, 2015) ("[W]here a treating physician's opinion is 'out of sync with the treating notes, the ALJ [does] not have the luxury of terminating his inquiry at that stage in the analysis.'  Rather, the ALJ must further develop the record to 'fill any clear gaps' and resolve the inconsistency." (second alteration in original) (citation omitted) (quoting *Hidalgo v. Colvin*, No. 12-CV-9009, 2014 WL  2884018, at *19 (S.D.N.Y. June 25, 2014))).

The ALJ's incorrect application of the treating physician rule and failure to adequately develop the record are both grounds for remand.

**III.   Conclusion**

For the foregoing reasons, the Court denies the Commissioner's motion for judgment on the pleadings, vacates the Commissioner's decision, and remands this action for further administrative proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g).  The Clerk of Court is directed to close this case.

Dated: February 23, 2021
       Brooklyn, New York

SO ORDERED:

　   s/ MKB
MARGO K. BRODIE
United States District Judge